IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No.: 14-cr-00082 |
| vs. | ) | |
| | ) | Hon. T.S. Ellis, III |
| PATRICK POULIN, | ) | |
| | ) | Sentencing: October 3, 2014 |
| Defendant. | ) | |
| | ) | |

## POSITION OF THE UNITED STATES ON SENTENCING

On March 6, 2014, defendant Patrick Poulin was charged in an Indictment, along with co-defendants Joshua Vandyk and Eric St-Cyr, with one count of Conspiracy to Launder Monetary Instruments, in violation of 18 USC §1956(h) and two counts of Laundering of Monetary Instruments, in violation of 18 USC §1956(a)(3)(B) and § 2. On July 11, 2014, a Criminal Information was filed charging defendant Poulin with one count of Conspiracy to Launder Monetary Instruments in violation of 18 USC § 371 and 18 USC §1956(a)(3)(B). On that same day, Poulin waived formal indictment and entered a guilty plea to the charge contained in the Criminal Information. The Probation Officer has determined that Poulin's total offense level is 24, after a three level reduction for timely acceptance of responsibility, which corresponds to an advisory Guidelines sentence of 51 to 60 months. *See* Final Presentence Report ("PSR") at p. 21, ¶¶ 113 and 114.

The United States recommends that the Court (1) find the applicable Guideline level is 22 corresponding to a range of 41-51 months in prison; (2) impose a below guideline sentence of 41 months after considering the sentencing factors under 18 U.S.C. §3553(a) because Poulin's

overall culpability is comparable to co-defendants Vandyk and St-Cyr, and the government recommended 41 month sentences as to those defendants; (3) reduce Poulin's sentence by 25% for the reasons stated in the United States' Motion for Downward Departure under U.S.S.G. § 5K1.1; and (4) impose a three-year term of supervised release; and (5) impose a $7,500 fine.

## I.  <u>FACTUAL BACKGROUND</u>

In connection with his plea, defendant Poulin admitted that he and his co-defendants participated in a conspiracy to launder monetary instruments, specifically $2 million in what was represented to him to be bank fraud proceeds.  Poulin admitted that he, Vandyk, and St-Cyr developed and marketed a method for US citizens to covertly funnel funds from the United States ("US"), through the Turks and Caicos, to the Cayman Islands without detection from the US Government, including the Internal Revenue Service ("IRS").  St-Cyr and Vandyk advised US citizens to create offshore foundations and corporations with the assistance of Poulin.  Poulin would then serve as a nominal board member in lieu of the US citizens in order to conceal their identities.

Poulin, St-Cyr, and Vandyk, agreed to launder $2 million.  Specifically, St-Cyr and Vandyk, through Company C, received $200,000 from the US, which they believed to be the proceeds of a bank fraud scheme, and laundered the money through Company C's financial accounts in the Cayman Islands and elsewhere.  The funds were sent from the US to Poulin's escrow account in the Turks and Caicos and then Poulin sent the funds from his escrow account to Company C's account in the Cayman Islands disguised as the funds of an offshore corporation.  These funds were returned to the US in the same circuitous route they were sent from the US – from Company C's account in the Cayman Islands through Poulin's escrow account in the Turks and Caicos and back into the US.  *See* Statement of Facts, Dkt. #85.

## II.    THE APPROPRIATE GUIDELINES RANGE

The parties and the Probation Officer agree to the majority of the applicable guidelines in this case.  In particular, the parties and the Probation Officer agree that pursuant to the terms of the plea agreement Poulin violated 18 USC §1956(a)(3)(B) and for purposes of the guidelines calculation, the defendant shall be treated as if he was convicted of an additional count charging a violation of 18 USC §1956(a)(3)(B) pursuant to U.S.S.G. §1 B1.2(c).  *See* Plea Agreement, Dkt. #84, at p. 3 and PSR at p.5, ¶ 14.  The parties and the Probation Officer further agree that:

(i)     The applicable guideline is § 2X1.1 (conspiracy) and, pursuant to § 2X1.1(a), it incorporates the base offense level and adjustments as set forth in the guideline for the substantive offense, which in this case is § 2S1.1 (money laundering);

(ii)    Pursuant to § 2S1.1(a)(2), the base offense level is eight, and a 16-level enhancement applies due to the $2,000,000 in purported criminal proceeds that the conspirators agreed to launder on behalf of undercover agents;

(iii)   Pursuant to § 2S1.1(b)(2), a two-level enhancement applies because the defendant stipulated to an offense under 18 USC § 1956;

(iv)    Pursuant to § 2S1.1(b)(3), a two-level enhancement applies because the stipulated offense involved sophisticated means;

(v)     Pursuant to § 2X1.1(b)(2), a three-level reduction applies because the defendant did not complete and was not about to complete, and did not anticipate that his co-conspirators had completed or were about to complete, all the acts believed to be necessary to launder the entire $2,000,000 in purported criminal proceeds; and

(vi)     Pursuant to § 3D1.2, the count of conviction and the stipulated money laundering offense are grouped together in a single group, and such grouping does not affect the guideline calculation recommended by the parties.

*See* Dkt. #84 at pp. 3-4 and PSR at pp. 5-6, ¶ 14.

The PSR also contains a two-point enhancement for use of a special skill pursuant to U.S.S.G. § 3B1.3.  PSR at p. 13, ¶ 64.  This enhancement was not addressed in the plea agreement, and the government and Poulin may, consistent with the plea agreement, take any position they wish as to its applicability.  *See* Dkt. #84 at p. 5 ("The parties have no other agreement or understanding regarding the application of the sentencing guidelines, and either party is free to argue for or against the application of any provision not specifically addressed above.").

The government supports the application of the special skill enhancement to Poulin. Poulin used his skill as a lawyer to facilitate and carry out the money laundering scheme and the use of the law firm trust account significantly enhanced the concealment of the crime.  By using the law firm trust account and not a regular bank account, the conspirators were able to avoid one more level of potential scrutiny, such as the anti-money laundering compliance efforts that would occur at a financial institution.   Poulin told the UCAs that if the money was never reported in the US then it could be wired to him and it would just disappear with no questions.

Furthermore, Poulin did not merely open a new corporation – he devised a complex, layered strategy to conceal the movement of the money to the Caymans.   Poulin suggested the use of his law firm trust account, the corporation created for the UCAs called "Zero Exposure," and a corporation he controlled in devising a structure to move the funds to the Caymans. According to a UCA transcript, Poulin stated:

Essentially what- what- what we want them to put together and to sign is a short, a one-pager kind of thing, which will say we've received this money, given it to Zero [Exposure]. Zero is lending it out to CBD or whoever, but probably CBD, and CBD is not paying back unless . . . you know, CBD will then invest it with Eric or wherever you happen to tell us to do it and CBD will not pay it back unless it gets it back, right, is the concept. And in there will also be the question of well, this is what CBD will charge for that service. Okay, the fee component. I would like to put in there simply that CBD will charge one point of the full amount, and you know, depending on the what the amount is, we can put a cap on it, but it won't be more than . . . right? We never got around to – if memory serve me right, the full amount is 2.5.

Transcript of Undercover Turks and Caicos Meeting of 12/11/2013, Pt. 2, at p. 4.

In Quebec, Poulin explained to the UCAs some of the options in setting up an offshore account in order to structure the transaction. He said they could utilize a foundation and the foundation should have three board members and the true owners of the foundation should not be board members. Poulin recommended that the three board members be himself, his law firm partner, and a Panamanian lawyer who would control the foundation on "paper only." He explained that having the UCAs listed as foundation board members would not look good in the US for tax purposes. Therefore, Poulin instructed the UCAs not to be listed or identified on paper for the foundation. Poulin said that the foundation would need an advisor (and this should not be the true owner of the foundation). Instead, the advisor should be someone they trust and was capable of directing where their money goes.

Poulin explained another way to structure the transaction. He said that a company could be set up anywhere because it would make it difficult to identify the true owners. Poulin recommended the foundation in country "A", the corporation in country "B", and the investment account in country "C". Poulin stated it would be even better if no account was opened and the money was sent straight to St-Cyr because foreign governments are placing a lot of pressure on

banks to identify the true account owners.[1]  Poulin recommended wiring the money directly to

his law firm's trust account.  Poulin instructed the UCAs to never send money directly to the

foundation because you do not want a link to the US.  Poulin recommended the company have

nominee directors, as well as nominee shareholders, and this would not look suspicious.  Poulin

stated the directors and shareholders should report to Poulin on paper (even if they really did

not).

 Poulin discussed the use of the attorney-client privilege as a shield.  During the meeting

in Quebec, the following statements were made by Poulin according to the UCAs:

> Poulin stated that the nominee company is very effective.  Poulin
> had only one anti-money laundering request for the United States
> and one TIEA (Tax Information Exchange Agreement) request
> from Canada.  Poulin claimed attorney client privilege in both
> cases and the issues "went away."

Memorandum of 9/11/2013 Meeting in Quebec, Canada at p. 3.

 According to an undercover transcript:

> UCA:  What about if they discover and then they say we feel there
> was fraud involved in the bankruptcy filing or in the payment of
> these corporations?  Would they be able to compel you guys?
> Let's say this discovered the whole story, you know, one of the
> employees goes and turns me in or something.  How much
> exposure –
>
> Poulin:  In the Turks and Caicos there would be . . . . I mean, we
> simply would not answer any communication, right?  They'd say .
> . . . Or, or "We acknowledge receipt and we can't answer because
> of both our bar rules and there's another law that specifically
> prevents us from doing it."

Transcript of Undercover Turks and Caicos Meeting of 12/11/2013, Pt. 2, at p. 10.

 As to acceptance of responsibility, the parties agreed that Poulin assisted the government

in the investigation and prosecution of his own misconduct by timely notifying authorities of his

---

[1] The government believes this is a reference to FATCA.

intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the prosecution and the Court to allocate their resources efficiently.   As a result, it is the position of the United States that Poulin qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a), and the United States hereby moves the Court to award an additional one-level decrease to the offense level pursuant to U.S.S.G. § 3E1.1(b).

Including the use of a special skill adjustment results in an adjusted offense level of 24. After determining Poulin's criminal history to be at Category I, the Probation Officer identified the advisory guideline range to be 51 to 63 months incarceration.

## III.   OTHER SENTENCING FACTORS

In addition to considering the properly calculated sentencing guidelines range, this Court should also consider other factors identified in 18 USC § 3553(a).  The government will address the most pertinent of those factors below.

### (A) Nature and circumstances of the offense

The Statement of Facts in this case does not tell the complete story of defendant Poulin and his co-conspirators' conduct.  St-Cyr and Vandyk developed and marketed a method for US citizens to covertly funnel funds from the United States, through the Turks and Caicos, to the Cayman Islands without detection from the US Government, including the IRS.  The layers of insulation used to conceal the identities of US citizens involved the creation of offshore corporations and trusts located in the Cayman Islands, Turks and Caicos, Panama, and Belize, the use of nominees to disguise the funds, and the assignment of a 5-digit unique code which clients (including US citizens) utilized to view their account balances online without using their actual names.

The accounts at Company C were designed to be confidential, anonymous, and impossible for the US Government to detect and trace. The offshore accounts were designed to assist citizens of the US to launder ill-gotten gains, conceal investment gains, and evade their personal income taxes. Numerous layers of insulation were included in the costly process that made it nearly impossible for the US Government to determine the true fiduciary beneficiaries of the offshore accounts.

In October 2011, an undercover agent with the IRS ("UCA-1") contacted Vandyk via email. UCA-1 assumed the identity of a wealthy US citizen interested in investing offshore. UCA-1 said he was worried about the value of the US Dollar, the general health of the US economy, and increased government debt and regulation. Vandyk responded and UCA-1 and Vandyk spoke for approximately one hour by telephone. At the time of this initial contact, Vandyk was employed by "Company B". Vandyk explained to UCA-1 that Company B managed $250 million in assets primarily for American clients, many of whom were doctors or dentists and that the account minimum was $100,000. He explained that the accounts were anonymous, there was no reporting of financial information to any government, and that funds were redeemed per client instructions. Vandyk explained that Company B could send money anywhere in the world without the US government knowing about it. He further stated that, in the Cayman Islands, if an investment earned 8%, then it would be a "clean return" -- the client would receive the entire 8% return, whereas in the US, there would be withholdings and other reporting requirements.

Between October 2011 and the beginning of 2013, there was no contact between UCA-1 and Vandyk. In January 2013, UCA-1 emailed Vandyk to inquire whether he was still working

at Company B. Vandyk responded, informing UCA-1 that he was no longer employed with Company B and had moved on to Company C, bringing some of his US clients with him.

Between January 2013 and March 7, 2013, UCA-1 and Vandyk corresponded and spoke by phone to coordinate a meeting in Miami, Florida. On March 7, 2013, Vandyk, St-Cyr, and UCA-1 met in Miami, Florida where Vandyk and St-Cyr were introduced to UCA-2 and UCA-3. UCA-2 assumed the identity of a financial planner that represented numerous US clients that were interested in investing offshore in order to evade paying US federal income taxes. UCA-2 also represented himself as the financial planner for UCA-3. UCA-3 assumed the identity of a US citizen interested in investing offshore in order to evade paying US federal income taxes. UCA-3 also indicated to Vandyk, and, at a later date St-Cyr[2] and Poulin, that he defrauded a bank and was in possession of ill-gotten gains. UCA-3, at the March 7, 2013 meeting, explained that he was interested in moving the proceeds of the bank fraud scheme offshore in order to avoid detection from the financial institution he defrauded, as well as law enforcement and the US Government. UCA-3 was also interested in investing "clean money" with Company C.

During the March 7, 2013 meeting, St-Cyr stated that no one on the Cayman Islands was FATCA compliant.[3] Vandyk explained that Company C did not take on Americans directly because it would be onerous in that Company C would have to register with the Securities and

---

[2] Based on a review of the undercover tapes, it is unclear whether St-Cyr heard the entire conversation detailing the nature of the funds. This conversation occurred during dinner on March 7, 2013 at a restaurant and the UCA was speaking directly to Vandyk while the other two UCAs were speaking to St-Cyr. *See* Statement of Facts, Dkt. #78 at ¶ 15. It is undisputed that at the January 2013 meeting in the Cayman Islands, St-Cyr was fully aware of the nature of the funds.

[3] The Foreign Account Tax Compliance Act (FATCA) became law in March 2010 to target non-compliance of U.S. taxpayers who failed to report foreign bank accounts with foreign financial institutions in foreign countries. One of the purposes of the scheme was to avoid the FATCA requirements and Vandyk and St-Cyr openly marketed their services as being non-compliant with FATCA. On November 29, 2013, the United States and the Cayman Islands signed a "Model 1" intergovernmental agreement on FATCA (IGA).

Exchange Commission ("SEC") and the IRS and that would require a lot of time and effort. But, Vandyk indicated that all of Company C's clients liked the fact that nothing they do touched the US. Vandyk and St-Cyr then explained the various mechanisms they used in order to take on US clients, including having their clients create Caymanian, Turks and Caicos, Panamanian or Belizean corporations, having a foreign attorney provide a letter of eligibility which shifted the due diligence onto the attorney, or creating a foreign nominee trust or foundation. Vandyk explained that they do not ask questions so they do not get answers. However, as was apparent from Vandyk and St-Cyr's email correspondence, conversations, and the meetings with UCA-1, UCA-2, and UCA-3, Vandyk and St-Cyr were fully aware that their clients were US citizens.

Soon thereafter, St-Cyr and Vandyk referred the UCAs to an attorney in Panama. UCA-2 and UCA-3 spoke to the attorney who was going to set up an offshore Panamanian corporation through which they would transfer the funds. However, this did not materialize and Vandyk and St-Cyr then referred UCA-2 and UCA-3 to Poulin to assist with setting up a nominee entity to facilitate the transfer of funds.

On July 16, 2013, Vandyk met with UCA-2 and UCA-3 in San Francisco, California. During this meeting, Vandyk told the UCAs that Poulin acted on behalf of several of their clients. UCA-2 and UCA-3 inquired whether Poulin would ask about the source of the funds, "[b]ecause that's, that's my biggest concern with this first batch. Now, if we do other, regular money that's from our business that we don't have to worry about, that's fine, but this batch is very sensitive." Vandyk responded that his biggest concern was that he is not dealing with "drug dealers and terrorists".

On September 11, 2013, UCA-2 and UCA-3 met with Poulin in Quebec, Canada. Poulin stated that a majority of his clients were US and Canadian citizens. Poulin then explained how to

set up an offshore account and instructed the UCAs that they should establish an offshore foundation in either Lichtenstein or Panama. The foundation should have three board members and the true owners of the foundation should not be board members; Poulin recommended himself and two of his associates as the "paper" board members. Poulin also advised that the foundation would need an advisor and that this also should not be the true owner of the foundation but instead someone the UCAs trust. Poulin explained that, for US tax purposes, it would not look good for them to be listed as board members.

Poulin explained that once the foundation was created he could set up a secondary company in the Turks and Caicos that would be owned by the foundation. Poulin recommended the foundation be established in country "A", the corporation in country "B", and the investment account in country "C" because this would make it impossible to figure out and trace. Poulin stated it would be even better if no account was opened and the money was sent straight to St-Cyr because foreign governments are placing a lot of pressure on banks to identify the true account owners. Poulin then recommended wiring the money directly to his law firm's trust account and instructed the UCAs never to send money directly to the foundation because they do not want a link to the Unites States. Poulin recommended the company have nominee directors, as well as nominee shareholders, and that this would not look suspicious. Poulin stated the directors and shareholders should report to Poulin on paper -- even if they really did not.

UCA-3 explained to Poulin that the money they planned on investing was currently deposited in numerous limited liability companies ("LLC's") located throughout the United States. UCA-3 further explained that the money came from a real estate investment where UCA-3 borrowed money from a bank in the United States. UCA-3 told the bank he planned on using the money to build a construction project, however, UCA-3 never constructed the intended

building.  The bank foreclosed on the property and UCA-3 kept approximately $2 million from the loan.  UCA-3 said the proceeds of the bank fraud were in corporate and individual bank accounts controlled by UCA-3 and that UCA-3 had declared bankruptcy.  UCA-3 further explained that the bank looked into the bankruptcy but UCA-3 had good books and records and hired quality attorneys and accountants; therefore, the bank did not discover the fraud.  UCA-3 explained that his goal was to now move the money out of the US accounts because the financial institution that was defrauded may take a second look and discover the fraud.  If the bank discovered the fraud then UCA-3 wanted the money gone from the accounts.  UCA-3 further explained that they want to invest this money with St-Cyr until the statute of limitations expired for the bankruptcy and then bring the money back to the United States.

Poulin inquired whether UCA-3 controlled the LLCs where the funds were deposited to avoid detection from the bank.  UCA-3 said that he indirectly controlled the LLCs because the LLCs were in the names of friends and family.  Poulin then asked if the money was declared with the government because if the money was declared then he would have to conduct a transaction, such as a sale, to get the money to the Turks and Caicos.  However, Poulin stated if the money was not declared then UCA-3 could simply wire the funds to the law firm trust bank account and "it will just disappear with no questions."  Poulin said that any deal or transaction would need to be conducted in a manner that did not raise any questions.

The UCAs inquired about the mechanisms for liquidating the account.  Poulin stated the account could be liquidated at any time to purchase assets.  For example, the foundation could purchase a boat, a condo, or make a deposit into a retirement account -- it all depended on what clients wanted to do with their money.  The UCAs told Poulin they intended to wire $200,000 to him to "test the waters" before they gave him all their money.

On December 11, 2013, UCA-2 and UCA-3 met with Poulin's law partner in the Turks and Caicos, with Poulin participating by video-conference call. During this meeting/conference call, UCA-2 raised concerns about the new exchange of information treaty the Cayman Islands had entered into with the United States. He stated his main goal was making sure they could not connect the money back to him. Poulin's law partner explained that the point of the structure was to conceal the UCAs' identities. If anyone was looking at the structure it would tie back to Poulin. UCA-2 reiterated that the initial money they were sending was sensitive – not just a tax issue – so that they needed it to be separated as much as possible from them. Poulin's law partner explained that it is now more expensive for US persons to get accounts in the Cayman Islands because of more aggressive tax authorities and the Patriot Act; US clients now require more layers and people to conceal their identities. Poulin's law partner marketed his and Poulin's services as being uniquely placed to do all of that because they are lawyers in a non-taxable offshore setting and cannot be compelled to answer questions.

UCA-2 and UCA-3 asked whether there would be any questions about the source of funds given the fact that the wire transfers would be coming in $200,000 to $250,000 increments from various shell companies in the United States. The UCAs explained that they had split the money into smaller amounts amongst various accounts in order to avoid scrutiny and wanted to make multiple wire transfers because of the sensitivity of the money. The UCAs explained that they wanted to send all of the sensitive money to Vandyk and St-Cyr and let it sit – not invest it. Then, they would "bring it back so then it's nice and clean money that I can use for whatever I want." Poulin's law partner explained that because the money is coming from an entity, they will not ask for the source of the funds and if they do, they can deal with it. For example, they could get a letter from the US corporation saying "[t]his is my corporation's retained earnings."

The authorities would not ask for any back-up on a $250,000 transfer. Poulin's law partner also explained that sometimes they like to have a balance sheet or financials for the company so that if someone was asking them about what is supposed to be "their [Poulin and Poulin's law partner's]" company, it would withstand any scrutiny. Poulin reiterated that if regulators inquired they would not be required to provide anything because they are a law firm. Both Poulin and Poulin's law partner openly joked that the IRS or FBI would not invest time in investigating a $200,000 fraud.

At the end of the meeting, UCA-2 and UCA-3 signed the paperwork to establish the offshore foundation called "Zero Exposure." They provided Poulin's law partner their US passports. On December 18, 2013, an offshore foundation called Zero Exposure was established in the Turks and Caicos. On December 17, 2013, UCA-2 wired $200,000 from a Northern Virginia bank account to the escrow account of the law firm in Turks and Caicos. Poulin confirmed receipt of the funds on December 18, 2013. Poulin then wired the $200,000 from the law firm to Company C in the Cayman Islands. On December 31, 2013, St-Cyr emailed Poulin confirming receipt of the $200,000 which was then emailed to UCA-2. Vandyk and St-Cyr then began managing the money.

On January 16, 2014, UCA-2 and UCA-3 met with Vandyk and St-Cyr in the Cayman Islands. The purpose of this meeting was to discuss the investment of the $200,000 sent by the UCAs. Vandyk and St-Cyr also provided UCA-2 and UCA-3 with a five-digit code to access the account and showed the UCAs screen shots of their account portfolio.

St-Cyr explained that the bank does not know who the UCAs/clients are and then Vandyk joked "[w]e don't know who you are either." Vandyk and St-Cyr explained that using a trust allowed the client to say he was not the beneficiary, which is the question asked on the tax

return.  The client can say they are the "enforcer."  UCA-2 inquired whether with respect to

"clean money" was it better to go through a trust or another entity.  Vandyk and St-Cyr stated

that with the clean money, a trust is more solid, whereas with the dirty money, the foundation is

the better option.

UCA-2 inquired about the fee structure "with the clean versus the sensitive money" --

was there going to be a fee distinction between that clean money?  St-Cyr responded that while

the overall amount of the money is going to be the driving force, it would be cheaper for the

more transparent money.

During the meeting, St-Cyr and Vandyk said that the UCAs should be careful when

contacting them about what is happening with the account.  St-Cyr said "[i]t's just everything we

do can be traced.  We just protect our ass…[i]f you ever have problems the first thing they are

going to do is grab your computer."  Vandyk added that "[t]hey can go back to the servers and

whatever.  I prefer a quick call."

UCA-3 explained to Vandyk and St-Cyr that Poulin was not returning their phone calls.

The UCAs were concerned because "[t]his money is sensitive.  If it was regular investment

money I wouldn't care….the money is hot I guess.  It's hot."  UCA-3 continued that he was

concerned that the loan officer or the appraiser might turn him in for fraud and reap a 10%

reward.  UCA-2 explained that they wanted to finish the test of the flow of the funds by seeing

how UCA-3's money came back into the US and what it looked like when it was deposited into

his account.  UCA-2 explained that they had another corporation they could put it into that was

totally unrelated to the original corporation so it was a clean separation.  St-Cyr explained that

they would need direction from Poulin to liquidate the account and then they would sell their

positions.  Poulin would ask about the source of the funds and they would say it was a loan to this new unrelated corporation.

The UCAs and St-Cyr then called Poulin to inform him that he needed to fill out the form to initiate the liquidation of their portfolio.  UCA-2 explained to Poulin that they were "thinking to keep it separate to complete what we were trying to achieve, which is get the money to a cleaner method."  UCA-2 questioned "[m]aybe we would get another account?  Do you want me to email you the new account it will go to?"  Poulin responded that he understood and instructed UCA-2 to send him the wiring instructions and only the wiring instructions, nothing else.

UCA-2 explained that he had other US clients that were interested in investing and an additional reason to bringing the funds back into the US was to see that the whole process worked in anticipation of his promoting Company C's services to other clients.

That evening, Vandyk and St-Cyr had dinner with the UCAs where they discussed additional funds that they expected would be wired in the near future – a total of $2 million, which would be comprised of additional dirty money, but to also include the $200,000 that they had just requested to be returned.  During dinner, St-Cyr joked "[s]eriously, we get really paranoid.  We've done some background checks on you.  We said the US is never going to pay for them to spend one week here.  They don't have the budget for that."  UCA-3 responded that "if it was my regular money then I wouldn't spend this much.  You have to build relationships long term."

On or about January 16, 2014, Poulin mailed a "beneficial owner" document to UCA-2 at an address in the Eastern District of Virginia.  On February 3, 2014, Vandyk and St-Cyr liquidated the UCAs funds and transferred those funds to Poulin for return to the UCAs.  Poulin then wire transferred the funds back into a bank account in Richmond, Virginia.

As detailed above, this was a sophisticated scheme involving a nominee corporation and recommendations to use attorneys in Belize, Panama, and Turks and Caicos who were willing to abuse the attorney-client privilege to conceal criminals' identities. Despite being told by the UCAs of the fraudulent nature of the money and that the money was "dirty" and "sensitive," the three defendants never balked at laundering the proceeds. Furthermore, the defendants' scheme was not intended to be limited to just money laundering; they solicited and marketed their services to US citizens to hide assets from the IRS. *See* Statement of Facts at ¶7.

**(B) The history and characteristics of the defendant**

Poulin, age 41 and a Canadian citizen, is married with three minor children. *See* PSR at pp. 16-17, ¶¶87 and 92. He graduated from St. Lawrence College in Quebec, Canada with a Diploma in College Studies. Poulin then graduated from the University of Ottawa in Ontario, Canada, with an undergraduate degree in Law. After participating in required supervised practice and articling, he earned a graduate law degree in Taxation and was called to the Bar in Canada in 1997. In addition to his admission in Canada, Poulin was also admitted to practice law in the Turks and Caicos. *Id.* at p. 18, ¶¶ 99-102.

Poulin joined the law firm in Turks and Caicos in 2008 where he grossed an average of $10,000/month. He was a 50% partner in the firm with his law partner and had other positions with the related entities Commonwealth Management Ltd., Apex Nominees Ltd., Apex Secretary Ltd., and Commonwealth Business Development Ltd. *Id.* at p. 19, ¶¶ 105-106

**(C)     General and Specific Deterrence**

For years, US citizens and offshore promoters have taken advantage of willing financial institutions, laws in tax havens that support secrecy and confidentiality, and lack of enforcement by foreign countries to create an atmosphere conducive to tax evasion and other criminal

operations' attempts to launder proceeds from illegal activity. In February 2009, UBS AG, Switzerland's largest bank, entered into a deferred prosecution agreement on charges of conspiring to defraud the US by impeding the IRS. Since that time, dozens of US citizens, foreign bankers, and financial advisers have been indicted, prosecuted, and sentenced for their use and promotion of offshore tax-havens to conceal the US citizens' income and assets from the IRS. Once Switzerland was "closed for business," those seeking to evade US taxes needed to find another venue in which they could hide their money from the IRS. The Caribbean was still a viable location and individuals like Poulin have moved into the tax evasion space vacated by the Swiss and by more ethical Caribbean firms.

These offenses are extremely difficult to detect and US law enforcement has to use sophisticated investigative techniques to uncover this criminal activity. In fact, this investigation initially began in October 2011 and did not come full circle until March 2014. Defendant Poulin's punishment should take into account the seriousness and scope of his criminal offense and the difficulty US law enforcement has in uncovering these crimes specifically because of the various clandestine mechanisms Poulin employed here. Poulin mocked the idea of the IRS or FBI investigating a $200,000 fraud. Furthermore, Poulin's punishment should also serve to deter future criminals from laundering proceeds of specified unlawful activity, concealing these funds from the United States government, and evading taxes. Therefore, the Court's sentence should also provide general deterrence to other criminals and emphasize the seriousness of the conduct at issue.

**(D)    The need to avoid unwarranted sentencing disparities among defendants with similar records**

There are two co-defendants in this case, Vandyk and Poulin.  Defendant Vandyk was previously sentenced to 30 months in prison.  Vandyk's guidelines were determined to be 41 to 51 months, and the Court imposed a below guideline sentence partly in recognition of Vandyk's ongoing cooperation.  *See United States v. Vandyk*, Transcript of Sentencing Hearing (Sept. 5, 2014) at 30-31 (THE COURT: "The reason I imposed a variant sentence is the factors that were raised. . . .  And I did take into account the matters that we talked about at the bench as well.  Not that they won't be taken into further account at the appropriate time.").  Defendant St-Cyt is scheduled to be sentenced on the same date as St-Cyr.  Unlike defendant Vandyk, whose cooperation will be dealt with further in a post-sentencing motion under Federal Rule of Criminal Procedure 35(b), the government will address St-Cyr's and Poulin's cooperation by means of motions filed at sentencing pursuant to U.S.S.G. § 5K1.1.

The government views each of the three defendants as equally culpable.[4]  The defendants worked together and relied on each other to commit the offense and each was equally important to the success the money laundering scheme.  Vandyk marketed his and St-Cyr's services and solicited clients, financial institutions, and trust and nominee services.  He was the public face of Company C and Company C would not have had any clients without his "front of the house" efforts.  St-Cyr's worked hand-in-glove with Vandyk as he was the investment advisor.  Clients needed to be assured that their monies would be invested wisely and earn money and in the money laundering scheme, investing the funds allowed for further concealment of its origin.  Poulin provided nominee services by assisting clients with creating entities which were used to

_____

[4] The government makes separate, individualized recommendations regarding each defendants' cooperation.

19

conceal assets and income from the US government and the IRS. He also served as a nominee and abused his skill as an attorney to add a further layer of secrecy to the scheme. Each served a vital and key role that was equally important to the success of the money laundering scheme.

Even the ways that the defendants' conduct differed from one another reinforces the view that they are comparably culpable. Vandyk had the most interaction with undercover agents, and was told on the largest number of occasions about the purported criminal nature of the proceeds at issue. St-Cyr had less interaction with the undercover agents, but he was the head of Company C, and was the person most directly responsible for Company C's role in the broader tax evasion conduct. Poulin used his special skills and status as a lawyer to create the pass-through entity for the money laundering scheme, but he was not a member of Company C and did not participate in all of its illegal conduct.

The government also notes that the instant offense is the first criminal conviction for each of the defendants, and submits that their personal and family circumstances are roughly comparable. Imposition of a sentence within the advisory range would also minimize the likelihood of sentencing disparities as to defendants in unrelated but similar cases.

On balance, the government submits that a comparable level of punishment should be assessed to each of the defendants, prior to consideration of the amount of cooperation that each has provided to the government. The government recommended bottom of the Guidelines sentences of 41 months, prior to consideration of any cooperation credit, for defendants Vandyk and St-Cyr. Based on the foregoing, the government makes the same 41 month recommendation for Poulin, notwithstanding the fact that his applicable Guideline range is two points higher.

## <u>CONCLUSION</u>

For the reasons stated, the government asks the Court to find that the PSR correctly determined the applicable guidelines, resulting in an advisory sentencing guideline range of 51-60 months. The government recommends that the Court sentence defendant Poulin to term of incarceration of 41 months, which was the government's sentencing recommendation for his two co-defendants. For the reasons stated in the Motion for Downward Departure, the government also asks the Court to reduce the defendant's sentence by 25% based on his cooperation (which, if applied to the bottom of the guideline range, would yield a sentence of approximately 31 months). The government submits that such a sentence is sufficient and not longer than necessary to accomplish the sentencing objectives identified in 18 USC § 3553(a). Finally, the government asks the Court to impose a three year term of supervised release and a fine of $7,500.

Respectfully submitted,

DANA J. BOENTE
United States Attorney

By:     /s/ Kosta S. Stojilkovic
        Kosta S. Stojilkovic
        Assistant United States Attorney
        Eastern District of Virginia
        U.S. Department of Justice
        Tel: (703) 299-3790
        Fax: (703) 299-3981
        kosta.stojilkovic@usdoj.gov

        TAMARA W. ASHFORD
        Acting Assistant Attorney General
        U.S. Department of Justice, Tax Division

By:   /s/ Caryn D. Finley
Caryn D. Finley, Assistant Chief
Todd A. Ellinwood, Trial Attorney
U.S. Department of Justice, Tax Division
601 D Street, NW
Washington, DC 20004
Tel: 202-514-5145
Caryn.Finley@usdoj.gov
Todd.A.Ellinwood@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2014, I will file the foregoing pleading with the

Clerk of the Court, who will then send a notification of such filing (NEF) to Vandyk's attorney.


/s/ Kosta S. Stojilkovic
Kosta S. Stojilkovic
Assistant United States Attorney
Eastern District of Virginia
U.S. Department of Justice
Tel: (703) 299-3790
Fax: (703) 299-3981
kosta.stojilkovic@usdoj.gov