**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,           ) | |
|     Plaintiff,                                     ) | |
|                                                            ) | CASE NO. 1:14-cr-82 |
|     v.                                                    ) | |
|                                                            ) | The Honorable T. S. Ellis, III |
| ERIC ST-CYR,                                        ) | |
|     Defendant.                                ) | Sentencing Hearing: October 3, 2014 |
|                                                            ) | |

**DEFENDANT'S POSITION ON SENTENCING**

COMES NOW the defendant, ERIC ST-CYR, by and through undersigned counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing. As the Court is aware, Mr. St.-Cyr pled guilty to a single count Information charging him with conspiracy to commit an offense against the United States, in violation of 18 U.S.C. Section 371. The single count offense pertained to Mr. St-Cyr's role (along with his co-defendants) in facilitating the use of offshore investment accounts in the Cayman Islands that were established in a manner to disguise the true owner of the funds, which were the proceeds of unlawful activity.

While, as demonstrated below, Mr. St-Cyr did not initiate the conduct that led to his conviction, he regrettably made the choice in January 2014 to join the conspiracy at issue. Mr. St-Cyr's acceptance of responsibility for his wrongdoing has been swift and absolute. As demonstrated in his guilty plea before this Court, he has accepted full responsibility for his actions and has acknowledged that there is no excuse or justification for the crime he committed. Mr. St-Cyr has had no previous contact, of any sort, with the criminal justice system, here or

abroad. He recognizes and deeply regrets the wrongfulness of his short-lived and aberrational criminal conduct, and has taken all steps possible to attempt to make amends for this conduct. He cooperated with law enforcement immediately upon his arrest, and continues to be a trusted source of information, on this matter and others. Additionally, as an example of his acceptance of responsibility, despite receiving a reasonable bond (with conditions he was able to meet) Mr. St-Cyr instead chose to begin serving his punishment and has been incarcerated in a state facility since his arrest.

For these and other reasons set forth below, Mr. St-Cyr asks this Court to fashion a sentence that will adequately account for the serious nature of his crime but that also recognizes his exemplary life prior to the conduct at issue in this case. Mr. St-Cyr respectfully submits that a variance to twenty-six (26) months imprisonment would fully serve the purposes of federal sentencing in the circumstances of his case. Mr. St-Cyr seeks this variance separate and apart from any reduction in his sentence that may be forthcoming based on his substantial cooperation. Following the submission of this memorandum and before Mr. St-Cyr's sentencing hearing, Mr. St-Cyr expects that the Government will submit a motion for a reduction of his sentence based on that cooperation. Mr. St-Cyr requests that any reduction in his sentence stemming from that motion be applied to the requested 26 months sentence.

### I. THE ADVISORY SENTENCE GUIDELINES RANGE

The statutory maximum punishment for Mr. St-Cyr's offense is imprisonment for up to five (5) years and a fine of the greater of $250,000.00 or twice the gross gain or loss. *See* Plea Agreement ¶ 1. The Presentence Investigation Report ("PSR") prepared in this case calculates Mr. St-Cyr's total offense level at 22 with a criminal history category of I, which together result in an advisory Sentencing Guidelines range of 41 to 51 months of incarceration. This calculation

is consistent with the parties' Guidelines recommendations that were included in the plea agreement. *See* Plea Agreement ¶ 4.[1]

Calculating the baseline advisory Guidelines range, however, is merely the first step in the federal sentencing process. *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the baseline Guidelines range, the court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id*. Once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether a variance from the Guidelines is warranted based on the circumstances and features of the case and the defendant before it. *Id*. Under the circumstances set forth herein, Mr. St-Cyr does not request a downward departure. Instead, we respectfully submit that the Court should grant Mr. St-Cyr a downward variance from the advisory Guidelines range.

## II. THE 18 U.S.C. § 3553(a) FACTORS FAVOR A DOWNWARD VARIANCE

The Supreme Court and Circuit Courts across the country encourage sentencing courts to exercise great discretion in imposing a just and fair sentence. *See e.g.*, *Spears v. United States*, 555 U.S. 261 (2009); *Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *United States v. Booker*, (2005). In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute. Following *Booker*, the district court must impose a sentence in accordance with the factors set forth in 3553(a), of which the advisory United States Sentencing Guidelines "now serve as one fact among several [that] courts must consider in determining an appropriate sentence." *Kimbrough*, 552 U.S. at 90. Pursuant to § 3553(a), the sentence imposed

---

[1] Counsel for the Government has indicated that it will be recommending a sentence at the low end of the Guidelines.

3

must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the kinds of sentence available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victims of the offense. 18 U.S.C. 3553(a)(1)-(7).

Under § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall*, 522 U.S. at 50; *see also id*. at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting Koon v. United States, 518 U.S. 81, 98 (1996)).

In the instant case, we submit that a sentence of twenty-six (26) months imprisonment is appropriate (*before* consideration of Mr. St-Cyr's substantial cooperation) after consideration of all of the § 3553(a) sentencing factors.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. St-Cyr acknowledges that he has committed a serious offense. The nature and circumstances of his offense are largely addressed in the offense conduct portion of the PSR, as well as in the statement of facts submitted at the time of his guilty plea. For that reason, we focus less in this submission on the nature and circumstances of the offense and more on the history and characteristics of Mr. St-Cyr.

#### 1. Family and Charitable Acts of Mr. St-Cyr

Mr. St-Cyr, now 50 years old, is a self-made, family-centered man. Growing up in a stable home in Canada, he was always taught the value of hard work. When Mr. St-Cyr was just seventeen, he left his parents' home and began supporting himself financially. As this Court has read in the numerous letters written by those close to Mr. St-Cyr, he is a highly supportive father, husband, and friend.

Mr. St-Cyr's daughters and wife are the focal point of his life. His youngest daughter, V. St-Cyr, speaks of the great life lessons her father has instilled in her. V. St-Cyr credits her father with exposing her to different cultures, religions, and beliefs, and it is through this lens that she has learned to never stop challenging herself and to never be afraid to question things around her. *See* Reference Letter of V. St-Cyr.[2]

Chloe, Mr. St-Cyr's older daughter, refers to her father as her "moral compass in life," as well as being her "best friend." Reference Letter of Chloe St-Cyr. She also emphasized that her father has taught her the value of hard work and not taking short cuts. *Id.*

Simply challenging his daughters and teaching them life lessons only scratches the surface of Mr. St-Cyr's role in his daughters' lives. Mr. St-Cyr has acted as their protector in a

---

[2] The Reference Letters written for Mr. St-Cyr are attached collectively as Exhibit A.

very real way. When Mr. St-Cyr's family lived in Trinidad in 2005, the family home was invaded by six armed men. Instead of running, Mr. St-Cyr confronted the men and diverted them from entering his home, allowing his family to hide while he did so. Subsequently, Mr. St-Cyr was severely beaten and threatened at gun point (to the point that the assailants pulled the trigger of the gun although luckily it did not go off) while his wife and children were able to escape. This terrifying incident speaks volumes about Mr. St-Cyr's willingness to place the security of his family before himself.

Moreover, despite the tight balance between family and work, Mr. St-Cyr always found time to give back to his community. In addition to being a youth soccer coach for many years, Mr. St-Cyr has been very active as a volunteer at the Cayman Drama Society ("theatre"), promoting the appreciation of theater by young people as well as by adults. His involvement is detailed in the reference letters of individuals like Paul M. de Freitas and Phil Pace. *See* Reference Letter of Paul D. de Freitas; Reference Letter of Phil Pace. In fact, Mr. St-Cyr took on responsibility for the food and beverage services at the theatre. As a non-profit organization, Mr. St-Cyr's role in this function (which was the theater's principal source of income) was essential for the theatre's survival. Additionally, Mr. St-Cyr joined the theater's Executive Board of Directors. He estimates that in the last few years, he has spent in excess of forty hours each month volunteering his time for the organization. Paul M. de Freitas, who is the theater's Manager, stated in his character reference that "It is difficult to imagine how many hours Eric devoted . . . but it must almost have seemed like a full-time job while productions were on stage." Reference Letter of Paul M. de Freitas.

Similarly, in the Cayman Islands Mr. St-Cyr was very involved with the Breast Cancer Gala Dinner, the Grand Cayman Rotary Club, Grand Cayman Humane Society, and the Heart

Ball (raising funds for medical research).  *See, e.g.*, Reference Letter of Frederic Morineau. Also, Mr. St-Cyr (who is a well-accomplished and passionate culinary artist) has helped train young, amateur chefs in such events as the "Out of the Kitchen Event" and "Cayman International Cook-Off."

Aside from these "organized" community events, his neighbors also recount Mr. St-Cyr's informal service to his community.  For instance, Neil and Kelly Rooney recount how Mr. St-Cyr, in the middle of the night, less than an hour after they posted their dog's disappearance on Facebook, was the only person that came immediately to their aid in a neighborhood search for their pet. *See* Reference Letter of Neil and Kelly Rooney.  Pam Welkener describes how when her mother was diagnosed with cancer and given only weeks to live, Mr. St-Cyr coordinated getting her four daughters to school, helping them with their homework, and cooking for them. *See* Reference Letter of Pam Welkener.

Thus, whether in his role of a father, volunteer, or neighbor, the personal accounts submitted to this Court consistently demonstrate a man with good values and love of his community.

### 2.  Mr. St-Cyr's Uncertain Future

Mr. St-Cyr recognizes that there is no one to blame for the consequences of his conduct other than himself.  Nonetheless, this Court should realize, that whenever Mr. St-Cyr is released from prison, his punishment will have just begun.  As a result of Mr. St-Cyr's conduct, he will no longer be able to work in the financial industry, a field he has been successfully employed in for the past three decades.  Mr. St-Cyr will no longer be able to contribute to financial publications, like the Wall Street Journal.  Additionally, before this offense, Mr. St-Cyr and his family planned on living their entire lives in the Cayman Islands.  They considered Cayman to be their home.

7

As a result of his crime, under Caymanian law, Mr. St-Cyr can no longer reside in Cayman, and his family has therefore been forced to sell their home and move back to Canada. At 50 years of age, Mr. St-Cyr has lost a majority of his financial wealth, and he has an uncertain future with his wife, who has recently filed for divorce. Thus, aside from his tarnished reputation, Mr. St-Cyr truly must rebuild all aspects of his life from scratch.

### 3. Acceptance of Responsibility and Post-Offense Remorse

After *Booker* and *Gall*, courts may grant additional consideration to defendants who demonstrate acceptance of responsibility "because such conduct bears directly on their character, 3553(a)(1), and on how severe a sentence is necessary to provide deterrence and punishment, 3553(a)(2)." *United States v. Severino*, 454 F. 3d 206, 211 (3d Cir. 2006). "The district court has a responsibility to look at the whole picture when making its determination of whether a defendant has genuine remorse." *United States v. Howe*, 543 F.3d 128, 135 (3d Cir. 2008). Mr. St-Cyr has consistently expressed remorse throughout this case. In the PSR and at his change of plea, Mr. St-Cyr described his conduct in this case as "the worst decision of [his] life." Notably, however, Mr. St-Cyr's actions post-arrest speak louder than his words. Despite receiving a reasonable bond (with conditions he was able to meet) Mr. St-Cyr instead chose to begin serving his punishment and has been incarcerated in a state facility since his arrest. And, significantly, he has consistently worked to be an honest and useful cooperator for the Government, at times placing his security in jeopardy.[3]

---

[3] We expect the Government will file a motion for a reduction in Mr. St-Cyr's sentence based on substantial cooperation. Subsequently, we look forward to describing this cooperation in greater detail for the Court.

8

### B. The Need to Avoid Unwarranted Sentencing Disparity

### 1. Similar Cases and Sentencing

The sentence Mr. St-Cyr requests is strongly supported by comparison to sentences imposed for similar conduct in this and other jurisdictions. Most significant is the sentence imposed on co-defendant Joshua Vandyk, which occurred on September 5, 2014.

During that sentencing, after consideration of all the Section 3553(a) factors, this Court granted a variance and imposed a sentence of thirty (30) months imprisonment for Mr. Vandyk while acknowledging that the variance did not take into account a potential Rule 35 motion likely to follow. Mr. Vandyk's advisory Guidelines range was identical to Mr. St-Cyr's advisory range (41-51 months incarceration). Moreover, as the Court found with Mr. Vandyk, Mr. St-Cyr (with the exception of the instant case) has lived an exemplary life devoted to his family and to his community.

In terms of their respective roles in the offense, Mr. St-Cyr is *at most* equally culpable to Mr. Vandyk. As the Government stated at Mr. Vandyk's sentencing, Mr. Vandyk was the individual who made the initial contact with the undercover agent soliciting U.S. taxpayers to use their services to conceal income from the United States. In fact, this occurred before Mr. Vandyk and Mr. St-Cyr became partners in Company C, while Mr. Vandyk was a salesmen for his previous employer. The Government would agree that while Mr. St-Cyr first learned in January 2014 that the funds at issue were proceeds of illegal activity (i.e., bank fraud), Mr. Vandyk was aware of that fact as early as March 2013. At a minimum, as stated in the PSR, all three defendants "held an equally important role in the scheme." *See* PSR ¶ 58. And, it should be noted that, while Mr. St-Cyr technically had a 66% ownership in Company C with Delta Group having the remaining 33% ownership, Mr. Vandyk had an option of half of Mr. St-Cyr's

ownership interest for $1 that he could assert at any time. *See* PSR ¶ 96. Further, Mr. Vandyk received the same compensation from Company C as Mr. St-Cyr.

Therefore, we ask this Court to follow the same reasoning it used in Mr. Vandyk's sentencing with regards to Mr. St-Cyr.

### 2. Other Offshore Tax Promoter Cases

While the specific offense at hand involves assisting investors in the laundering of money, the Government has repeatedly argued that the heart of this case is the criminal assistance provided to United States taxpayers in evading their tax obligations. During the sentencing of Mr. Vandyk, when considering the 3553(a) arguments set forth by Mr. Vandyk, the government, in an unprompted fashion, reminded the Court of this very fact. *See* Sentencing of Joshua Vandyk on September 5, 2014 (attached hereto as "Exhibit B"), at 25-26. The Government explained that the 3553(a) factors need to be considered with respect to the "overall business model" of the defendants, which was to "assist U.S. taxpayers in evading their tax obligations." *Id.* at 25. During the Vandyk sentencing, the Government explained that the business model of Mr. St-Cyr and Mr. Vandyk was to fill the void left behind by the larger institutions in Switzerland in the post-UBS world, and that this needed to be taken into account when considering the potential for deterrence of these sentences. *Id.* at 25-26.

Criminal tax cases, in general, are few in number and present unique facts and circumstances for purposes of sentencing. Many times, those charged with criminal tax offenses have no criminal record, do not present danger to the public, and have timely accepted responsibility. Further, criminal tax cases involving promoters who enabled United States taxpayers to evade their tax obligations are even rarer. Including the three co-defendants involved here, approximately twenty-two indictments have been brought against offshore

10

promoters in this realm. Of these twenty-two, around half are still fugitives who have not faced their charges. Of the remaining eleven, only two others have pleaded guilty and been sentenced: Martin Lack and Christopher Rusch.

Martin Lack was charged with and pleaded guilty in the Southern District of Florida to a one count Information in violation of 18 U.S.C. Section 371. *U.S. v. Lack,* No. 0:11-cr-60184 WPD (S.D.F.L. May 27, 2014). The facts surrounding Lack's indictment were egregious.[4] The PSR in the Lack case concluded that the appropriate offense level was a 21, with a criminal history of Category I, yielding a guideline range of 37 to 46 months incarceration.[5] Ultimately, after the Government filed a downward departure motion pursuant to Section 5K of the Sentencing Guidelines, Lack was sentenced to five years of *probation* and was allowed to return to Switzerland.

Christopher Rusch was charged with and pleaded guilty to conspiracy to defraud the government on February 6, 2013. *See, United States v. Kerr*, 2013 WL 4430917 (D. Ariz. 2013). Unlike Lack, Rusch did not travel to the United States on his own accord. Instead, he was arrested in Miami after being expelled from Panama at the request of the United States government. The schemes employed by Rusch resembled those set forth by Lack. *Id.* Of particular relevance, some of the overt acts involved in the conspiracy included the creation of nominee entities in foreign tax havens, the opening of undeclared accounts in foreign tax havens, the deposit of stock into undeclared accounts, the sale of stock held in undeclared accounts, the repatriation and use of funds held in undeclared accounts, the concealment of assets purchased

---

[4] According to the indictment, Lack, a citizen and resident of Switzerland, founded his own investment management firm in Zurich in 2002. Thereafter, he assisted U.S. customers to open and maintain secret bank accounts at a Swiss cantonal bank headquartered in Basel, Switzerland, with the assistance of a private banker at the bank. Lack traveled to the U.S. to conduct banking for U.S. customers with undeclared accounts and conducted currency transactions in the U.S. in violation of federal banking and currency reporting laws." Lack Press Release, http://www.justice.gov/opa/pr/2011/August/11-tax-995.html

[5] Your undersigned concedes that Lack traveled to the United States under his own volition to face the charges against him.

with repatriated funds, and failing to disclose the undeclared accounts on the FBARs filed. *Id.* Ultimately, Rusch was sentenced to serve ten months incarceration for his actions. *Id.*

We ask the Court to consider these cases and punishments when fashioning a sentence for Mr. St-Cyr. The Government has argued that a significant goal of sentencing here is to serve as a deterrent to individuals participating in offshore tax avoidance, post-UBS. As demonstrated above, any sentence imposed on Mr. St-Cyr likely will surpass any prior sentence made post-UBS.

### C. Additional Consequences Faced by Mr. St-Cyr as a Noncitizen

Mr. St-Cyr's noncitizen status in the United States also should be taken into account when considering a variance. In the time it takes Immigration and Customs Enforcement to complete the removal process of noncitizens after they have served their sentence, noncitizen defendants can face additional time in custody, and therefore be incarcerated longer than citizens who have committed the same offense.[6] In *U.S. v. Camejo,* the court stated that "district courts *can* depart downward on the basis of factors relating to immigration-related factors." *U.S. v. Camejo*, 333 F.3d 669, 677 (6th Cir. 2003), *see also, United States v. Montez-Gaviria*, 163 F.3d 697 (2d Cir. 1998) (recognizing the availability of a downward departure where defendant spent time in immigration custody, which was not credited elsewhere).

Additionally, it is quite possible that the Bureau of Prisons will consider Mr. St-Cyr as a deportable alien. As such, he is *less likely* than a similarly situated citizen to serve his sentence in a minimum security facility or camp. He also does not qualify for a halfway house, Community Corrections Center, or home confinement. *See* U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification,* Ch. 5, at 9

---

[6] Immigration and Customs Enforcement ("ICE") is generally required to physically remove a noncitizen from the United States within a period of 90 days from the date of a final order of removal. *See,* NCIDS Procedures Related to Removal, Chapter 7.4. During this time period, ICE is required to detain a noncitizen. *Id.*

(9/12/2006), available at www.bop.gov/policy/progstat/5100_008.pdf.  Courts in this circuit have held that they are free to consider these circumstance in determining whether to depart from the Guidelines.  *See, e.g.*, *United States v. Hyppolite*, 65 F.3d 1151, 1159 (4th Cir. 1995)(implicitly concluding that district courts may depart based on an individual's deportable alien status); *see also United States v. Smith*, 27 F.3d 649, 654-56 (D.C. Cir 1994) (holding that a departure from the Guidelines may be appropriate in circumstances where a defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his confinement).

While Mr. St-Cyr has waived his rights related to removal from the United States, there is no guarantee that he will not serve additional time in immigration custody following his term of imprisonment.  It is also more likely that he will be incarcerated in a more severe facility than a similarly situated citizen who committed the same offense.  Therefore, Mr. St-Cyr requests that this Court consider these facts in determining a reasonable sentence.[7]

---

[7] This is why Mr. St-Cyr requests a variance to 26 months imprisonment as opposed to the 30 months incarceration that the Court imposed on Mr. Vandyk, who is a U.S. citizen.

## III. CONCLUSION

WHEREFORE based on the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. St-Cyr respectfully requests that this Court sentences him outside the Guidelines with a variance to twenty-six (26) months imprisonment separate and apart from any motion later filed by the Government for a reduction in his sentence based on substantial cooperation.

Dated: September 26, 2014            Respectfully submitted,


/s/ Daniel Lawrence Rashbaum
Daniel Lawrence Rashbaum
Florida Bar No. 75084 *(Admitted Pro Hac Vice)*
*Attorney for Eric St-Cyr*
MARCUS NEIMAN & RASHBAUM LLP
2 S. Biscayne Blvd., Suite 1750
Miami, Florida 33131
Tel: 305-400-4260
Fax: 866-780-8355
drashbaum@mnrlawfirm.com


/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Eric St-Cyr*
SCHERTLER & ONORATO, LLP
575 7th Street, N.W. Suite 300 South
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of September, 2014, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties

.

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Eric St-Cyr*
SCHERTLER & ONORATO, LLP
575 7th Street, N.W.  Suite 300 South
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177
ssears@schertlerlaw.com